UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

JOSEPH R. WERTH,
by his next friends,
MARY and GENE WERTH,

        Plaintiff,

        v.                            Case No. 05-C-0040

BOARD OF DIRECTORS OF THE
PUBLIC SCHOOLS OF THE
CITY OF MILWAUKEE;
JOSEPH KRUZEL;
STATE OF WISCONSIN, DEPARTMENT
OF HEALTH AND FAMILY SERVICES,

        Defendants.

---

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

      Joseph Werth, through his parents, sues the defendants regarding two alleged

incidents in which he was injured by other students at South Division High School in

Milwaukee, Wisconsin, while in defendant Joseph Kruzel's shop class.  Kruzel and the Board

of Directors of Milwaukee public schools move for summary judgment.

SUMMARY JUDGMENT STANDARD

      Summary judgment is proper if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with any affidavits, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving

party has the initial burden of demonstrating it is entitled to summary judgment.  *Id.* at 323.

Once this burden is met, the nonmoving party must designate specific facts to support or

defend each element of the moving party's cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The existence of *any* factual dispute does not defeat a summary judgment motion; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Therefore, summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. To establish that a question of fact is "genuine," the opposing party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in the opposing party's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. A "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587. "A district judge faced with [a summary judgment] motion must decide . . . whether the state of the evidence is such that, if the case were tried tomorrow, the

plaintiff would have a fair chance of obtaining a verdict.  If not, the motion should be granted and the case dismissed."  *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989) (citations omitted).

UNDISPUTED FACTS

At the time of the events underlying this lawsuit, Joseph M. Kruzel was employed as a technical education teacher at South Division High School, which is a part of what is commonly called the Milwaukee Public Schools, or MPS.  (Defs.' Proposed Findings of Fact (DPFOF) ¶ 1.[1])  As of 2001, Kruzel had been a teacher with MPS for more than twenty-five years.  (DPFOF ¶ 2.)

Joseph Werth was a disabled minor who began attending ninth grade at South Division at the start of the school year in the fall of 2001.  (DPFOF ¶ 3; PPFOF ¶¶ 9, 13; M. Werth Dep. at 3-4[2].)  Werth had been diagnosed with cleidocranial dysostosis syndrome, a congenital disorder of bone development, characterized by absent or incompletely-formed collar bones, an abnormally shaped skull, characteristic facial appearance, short stature, and dental abnormalities.  (Pl.'s Proposed Findings of Fact (PPFOF)[3] ¶ 1; Defs.' Resp. to Pl.'s

---

[1]Unless otherwise noted by the court, either a cited proposed finding of fact is undisputed or the court has viewed any dispute in plaintiff's favor.

[2]The depositions of Joseph Kruzel, Werth's mother Mary Werth, and Werth are attached as exhibits A, B, and C, respectively, to the Affidavit of Thomas D. Miller, which is attached to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment, docket number 21.  Rather than citing to "Pl.'s Br. in Resp., Miller Aff., Ex. ___" each time, the court will simply cite to the deposition by name.

[3]Plaintiffs' proposed findings of fact are found in a combination document titled "Plaintiff's Response to Defendants' Proposed Findings of Fact and Plaintiff's Proposed Findings of Fact."  The court refers to the specific part of the document, i.e., either the Plaintiff's Response or the Plaintiff's Proposed Findings of Fact, to clarify which paragraph number is referenced.

Proposed Findings of Fact (Defs.' Resp.)[4] ¶ 1; Miller Am. Aff., Ex. 1 at 11.) *See also* Stedman's Medical Dictionary 598-99 (28th ed. 2006). Werth had a hump on his back and was considerably smaller than other high school students. (PPFOF ¶¶ 22-23; Kruzel Dep. at 33.)[5]

Werth attended MPS schools for grades one through seven, and a parish school for eighth grade. (PPFOF ¶¶ 3-5; M. Werth Dep. at 37.[6]) The school district prepared an Individualized Education Program (IEP) for Werth when he attended elementary school and middle school. (PPFOF ¶ 6.) While he attended MPS schools, Werth's physical disabilities subjected him to verbal attacks and mockery by other students. (PPFOF ¶ 2; Defs.' Resp. ¶ 2.[7])

When Mary Werth, Werth's mother, registered Werth at South Division, she told the assistant principal about the difficulties Werth had experienced at other schools because

---

[4]Defendants' responses to plaintiff's proposed findings of fact are also found in a combination document entitled "Defendants' Reply to Plaintiffs' Response to Defendants' Proposed Findings of Fact and Defendants' Response to Plaintiffs' Proposed Findings of Fact." Again, the court refers to each part separately.

[5]Defendants object to the proposed findings in this paragraph regarding Werth's particular disability and appearance, arguing that the actual disability is irrelevant. (Defs.' Resp. to Pls.' Proposed Findings of Fact ¶ 1.) However, the court finds these proposed findings helpful for background purposes to understand the case more fully. Defendants also object to the proposed finding regarding Werth's specific medical condition as not backed up by the evidence, as Mary Werth's deposition does not refer to Werth's particular medical condition. Although she referred in her deposition to an Individualized Education Program, the IEP was not filed with the other materials in opposition to the summary judgment motion. Werth filed the IEP only after defendants' reply brief was filed. Because the IEP was not submitted timely it will not be considered by the court regarding Werth's arguments. However, the court will consider it as evidence for the purpose of identifying Werth's medical condition, especially as the parties do not dispute what that medical condition is.

[6]Defendants object to these proposed findings as well as PPFOF ¶ 6, contending that they are irrelevant because Werth's claims in this case do not involve events during these years and any IEP at those schools has no bearing on an IEP prepared at South Division. (Defs. Resp. ¶ 3-7.) However, the court finds these facts relevant to show the School Board's prior knowledge of Werth's disabilities and that an IEP had been required.

[7]Werth presents no evidence that the defendant School Board or Kruzel knew of these other incidents.

4

of his disabilities and physical appearance.  (PPFOF ¶ 9.)  The assistant principal told Mary

Werth that the school would make sure nothing would happen to Werth because it was a safe

school.  (PPFOF ¶ 10.)  The assistant principal explained that the school had security guards

who would ensure Werth's safety.  (PPFOF ¶ 12.)[8]

Werth was a student in Kruzel's ninth hour woodshop class during the school

semester that ran from about August 24, 2001, to January 21, 2002. (DPFOF ¶ 3; PPFOF ¶

14.)  Sometime prior to October 16, 2001, Kruzel met with Werth's mother, who informed

Kruzel about Werth's disabilities.  (DPFOF ¶ 9; Kruzel Dep. at 28-29.)  At that meeting, Mary

Werth told Kruzel that Werth was very susceptible or sensitive to pain.  (PPFOF ¶ 19; Kruzel

Dep. at 31-32.[9])

On October 3, 2001, Mary Werth initiated a "Special Education Referral" for

Werth.  (PPFOF ¶ 25; *see* M. Werth Dep. at 23-24.[10])  Kruzel did not recall seeing any referral

concerning Werth until after October 16, 2001.  (PPFOF ¶ 26, 33.)[11]  Prior to that date, no one

---

[8]Defendants object to PPFOF ¶¶ 9 and 10 as irrelevant because there is no evidence that Mary Werth coupled this information with any request for additional measures to protect Joseph's safety, and no evidence exists that such a disclosure required any additional measures or that the School Board or Kruzel were aware of any such measures to be taken. (Defs.' Resp. ¶ 9-10.) Defendants object to PPFOF ¶ 12 as irrelevant because there is no evidence that the guards could have been assigned to Werth in every class or that such an assignment would have prevented the incidents underlying this case.  Again, the court finds the facts useful for background information.  Further, the court finds these facts relevant to plaintiff's substantive due process argument.

[9]Defendants object to this proposed finding of fact as irrelevant because there is no evidence that Werth's mother or anyone employed by the School Board had concluded that any additional steps had to be taken regarding Joseph's school arrangements and his susceptibility or sensitivity to pain.  (Defs.' Reps. ¶ 19.) However, the court finds this proposed finding to relevant to Werth's due process, Rehabilitation Act, and ADA claims.

[10]Defendants object to this and related proposed findings as irrelevant as there is no evidence that the referral request or other paperwork would have led to any actions to provide for Werth's safety in Kruzel's class different than what was undertaken.  (Defs.' Resp. to Pls.' Proposed Findings of Fact ¶¶ 25-26.)  The court finds these proposed findings relevant for purposes of plaintiffs' argument regarding Werth's high school IEP.

[11]Defendants object to these proposed findings as irrelevant.  The court finds them relevant to Werth's substantive due process, Rehabilitation Act, and ADA claims.

5

from the School District or the special education department at South Division talked to Kruzel about ways to keep Werth safe from other students in the class. (PPFOF ¶ 79.[12])

Throughout Kruzel's career, special education teachers often accompanied students to his classes and identified themselves so he would know whom to contact if a problem with the student arose. (PPFOF ¶ 27; Defs.' Resp. ¶ 27; Kruzel Dep. at 24.) However, at South Division, Kruzel recalled just one occasion when a special education teacher or aide accompanied a special education student throughout class. (PPFOF ¶ 30; Kruzel Dep. at 24-25.) With regard to Werth, the special education teacher did not meet with Kruzel to discuss Werth's special needs before he started attending Kruzel's class. (PPFOF ¶ 32.)[13]

Kruzel had forty students in the ninth hour class and was the only instructor. (DPFOF ¶ 5.) During the Fall 2001 semester, Kruzel had a paraprofessional aide to assist with his classes, including Werth's class. (PPFOF ¶¶ 96-97.) However, the aide was not a special education aide and was not assigned directly to Werth. (PPFOF ¶ 98.)[14] A security guard accompanied Werth to Kruzel's class as a protection so other students would not harass him. (PPFOF ¶ 24.)

---

[12]Defendants object to this proposed finding as irrelevant. The court finds the proposed finding relevant to Werth's substantive due process, Rehabilitation Act, and ADA claims.

[13]Again, defendants object to the proposed findings of fact in this paragraph as irrelevant, but the court finds them relevant to the plaintiffs' substantive due process argument and as background.

[14]Defendants object to PPFOF ¶¶ 96 through 98 as irrelevant because there is no evidence this aide could have stood near Werth at all times or prevented either of the assaults. The court finds the proposed findings of fact relevant to the substantive due process claim.

6

Most students in Kruzel's class were generally fifteen or sixteen years old. (DPFOF ¶ 6.) During class, Kruzel would constantly go from student to student, helping them make small wood decorative objects. (DPFOF ¶¶ 7-8.)

On October 16, 2001, Werth and the other students were working on projects. (DPFOF ¶ 10; PPFOF ¶ 34.) Larry W., another student, was working on a project at a machine located about two feet from Werth. (PPFOF ¶ 36.) Larry W. was a problem student and Kruzel called him "incorrigible." (PPFOF ¶ 37; Kruzel Dep. at 61-61.[15]) Larry W. presented a danger to other students because he would run and push and did not observe safety rules. (PPFOF ¶ 38; Defs.'s Resp. ¶ 38; Kruzel Dep. at 64.)

During the middle of class, Kruzel walked to his office. (DPFOF ¶¶ 11, 12; Pl.'s Resp. ¶ 2; J. Werth Dep. at 16.) Larry W. picked up two pieces of wood and threw them at Werth, one at a time. (PPFOF ¶ 39.) The two pieces of wood struck Werth in the back. (PPFOF ¶ 40.) Each piece was about four by four by one and a half inches. (PPFOF ¶ 41.) Kruzel was in the office adjacent to the classroom when Larry W. struck Werth with the pieces of wood. (PPFOF ¶ 42.) However, Kruzel could see what was happening in the classroom through the glass window in his office and saw Larry W. hit Werth with the pieces of wood. (PPFOF ¶¶ 43-44.)

Werth picked up the two pieces of wood, took them to Kruzel's office, and complained that Larry W. had thrown them, hitting Werth in the back. (PPFOF ¶¶ 45-46; DPFOF ¶ 15; J. Werth Dep. at 19.) Kruzel claimed that he did not see Larry W. strike Werth

---

[15]Defendants object to this proposed finding as irrelevant because there is no evidence that Larry W.'s prior conduct was in any way connected to Werth or that any of Larry W.'s prior problems would have resulted in him being excluded from the class with Werth. However, the court finds the proposed findings relevant to Werth's substantive due process, Rehabilitation Act, and ADA claims.

with the wood and told Werth to sit back down. (PPFOF ¶ 47.) Werth was not crying. (DPFOF ¶ 16; Pls.' Resp. ¶ 6.) Moreover, Kruzel did not observe any sign of injury. (DPFOF ¶ 17; Pls.' Resp. ¶ 7.[16]) Werth returned to his worktable. (PPFOF ¶ 48.)

Another student, Joe F., also threw a wood board about four by four by one and a half inch in size, striking Werth's neck. (PPFOF ¶¶ 49-50.) Werth told Kruzel that he was hurt. (PPFOF ¶ 51.) Again, Kruzel told Werth that he did not see it and to go back to work. (PPFOF ¶ 52.) Werth returned to his worktable. (PPFOF ¶ 54.) Kruzel did not talk to either Larry W. or Joe F. at this time regarding Werth's complaints. (PPFOF ¶ 53.[17])

Larry W. threw two more boards at Werth, again striking him in the back. (PPFOF ¶ 55.) Werth told Kruzel that Larry W. had again hit him in the back with wood boards. (PPFOF ¶ 56.) Kruzel said he did not see it but he would take Werth's word. (PPFOF ¶ 57.) Kruzel wrote a referral slip against Larry W., submitted it to the school office and Larry W. was suspended. (DPFOF ¶¶ 18-19.) Joe F. was suspended also. (PPFOF ¶ 61.)

Following the October 16, 2001, incident, Werth suffered numbness in his legs and swelling in his spine. (PPFOF ¶¶ 62-64.[18]) He remained out of school until January 2002. (*See* PPFOF ¶ 82.)

---

[16]Kruzel says in his affidavit that he looked at Werth's neck. Werth objects, saying Kruzel did not examine him. However, the citation to Werth's deposition does not support the objection; the pages cited contain no reference either way regarding any physical examination. The court finds whether Kruzel examined Werth to be irrelevant.

[17]Defendants object to this proposed finding regarding Joe F., stating that there is no indication that Joe F. did anything further that day or later to Werth. (Defs.' Resp. ¶ 53.) The objection is not responsive to the fact asserted by plaintiffs.

[18]Defendants object to these and other proposed findings regarding Werth's injuries as irrelevant to the matter of liability at issue in the summary judgment motion. (Defs.' Resp. ¶¶ 62-65, 94-95.) However, the court finds these facts relevant to the element of the Rehabilitation Act and ADA claims concerning severity of any harassment.

Sometime after the October 16, 2001, incident, T.R. Fitch, the head of the disability department at South Division, called Werth's mother to discuss how to return Werth to South Division. (PPFOF ¶ 66.) Werth's mother told Fitch that she wanted to make sure Werth would be safe if he returned to South Division. (PPFOF ¶ 67.) Fitch told Werth's mother that Werth would be able to leave class early so he would not be in the hallways with other students and that security guards would ensure his safety in the hallways. (PPFOF ¶¶ 68-69.) Fitch told Werth's mother that he would inform the teachers and guidance counsels to keep extra watch over Werth in class. (PPFOF ¶ 70.) Fitch also told Werth's mother that Larry W. was no longer at South Division and that Joe F. would not be in any more classes with Werth. (PPFOF ¶¶ 71-72.)

On December 6, 2001, Werth and his mother attended an IEP meeting at South Division. (PPFOF ¶ 73.) During the IEP meeting, several School District personnel assured Mary Werth that Werth would be safe at South Division. (PPFOF ¶ 74.) However, the IEP did not set forth any measures that the School District would take to protect Werth. (PPFOF ¶ 75.)

In December 2001, Kruzel attended an IEP meeting concerning Werth. (PPFOF ¶ 76.) At the meeting, the only discussion about keeping Werth safe centered on accommodations to allow him to perform woodwork safely. (PPFOF ¶ 77.) At the meeting, Kruzel voiced his belief that Werth should not have been assigned to his class. (PPFOF ¶ 80.) One basis for this belief was that the school did not provide a special education aide to stand by Werth. (PPFOF ¶ 81.)[19]

---

[19]Defendants object to PPFOF ¶¶ 80 and 81 on the ground that Kruzel had no power to exclude Werth from class and that the decision to return Werth to class was not the School Board's but rather his mother's. The court finds these proposed findings relevant to Werth's "class of one" equal protection argument.

Werth returned to South Division in January 2002 after the holiday break. (PPFOF ¶ 82.) On January 14, 2002, Kruzel was again teaching the class that included Werth. (DPFOF ¶ 20.) Another student, Roberto S., began teasing Werth about the project Werth was working on. (PPFOF ¶ 84.) Roberto S. then threw a pair of safety glasses at Werth, striking him in the head and jaw. (PPFOF ¶ 89.) When the incident occurred, Kruzel was in the classroom, standing in front of his office watching the students. However, he was not close enough to hear Roberto S. teasing Werth about his wood project and did not observe anyone harassing Werth. (DPFOF ¶ 23; Pl.'s Resp. ¶ 9; PPFOF ¶¶ 86-88; Defs.' Resp. ¶ 85.)

Werth came up to Kruzel, told Kruzel what happened, that Roberto S. had hit Werth with an object, and that Werth was struck on the left wrist. (DPFOF ¶ 21; PPFOF ¶ 90.) Kruzel said he did not see Roberto hit Werth but said he would take Werth's word for it. (PPFOF ¶ 91.[20]) Kruzel did not observe any injury. (DPFOF ¶ 22; Pls.' Resp. ¶ 8.[21]) Kruzel wrote a referral slip for Roberto S. and sent him to the school office. (DPFOF ¶ 25; PPFOF ¶ 92.) Roberto S. was suspended for three days for striking Werth with the safety glasses. (PPFOF ¶ 93.)

Werth suffered a concussion and cracked teeth, which had to be pulled, as a result of being hit with the safety glasses by Roberto S. (PPFOF ¶¶ 94-95.) Kruzel had not observed anyone harassing Werth the entire semester, although he had heard from other teachers that Werth was harassed and teased in other classrooms. (DPFOF ¶ 24; Pls.' Resp.

---

[20]Defendants object to this proposed finding, saying it unnecessarily duplicates DPFOF ¶¶ 21 and 23. (Defs.' Resp. ¶ 91.) However, it does not.

[21]As before, Kruzel says in his affidavit that he looked at Werths neck. As before, the court finds whether Kruzel examined Werth to be irrelevant.

¶ 10; PPFOF ¶ 35; Kruzel Dep. at 30.[22])  Occasionally, Kruzel had problems with other students throwing pieces of wood in his class.  (PPFOF ¶ 59.[23])

DISCUSSION

Werth disavows any claim under the Individuals with Disabilities in Education Act (IDEA), pursuant to which his IEP was developed.  (Compl. at 5.)  Instead, he alleges constitutional violations under the Rehabilitation Act and the Americans with Disabilities Act, as well as a state tort.

A.    Constitutional Claims

Werth sues Kruzel and the School Board under 42 U.S.C. § 1983, which requires that he establish that (1) a defendant deprived him of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law.  The second requirement is not disputed.

Werth sues Kruzel in his individual and official capacities.  A suit against a government employee in his official capacity is a suit against his employer.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Thus, the official capacity claim against Kruzel is the same as the claim against the School Board.

The School Board is sued as a public corporation.  (Compl. at 1, 2.)  A local government cannot be held liable under § 1983 on a respondeat superior basis.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978).  Instead, a local government is liable only

---

[22]Plaintiffs object to defendants' proposed finding that Kruzel had not observed harassment of Werth, but their citation supports only a finding that Kruzel had heard about teasing from other teachers, not that he had observed it himself.  No evidence indicates whether Kruzel heard these reports from other teachers before or after the two incidents at issue in this case.

[23]Defendants contend that this proposed finding is irrelevant because there is no evidence that Larry W., Joe F., or Roberto S. should have or would have been excluded from Kruzel's class on the dates of the incidents in question due to any prior incidents of students throwing wood in class.  (Defs.' Resp. ¶ 59.)  The court finds the proposed finding relevant to Kruzel's knowledge of the safety dangers in his classroom.

for acts for which the entity itself is responsible, meaning acts the entity has embraced as policy or custom. *Id.* at 690-91, 694. To show such responsibility, a plaintiff must prove that (1) the alleged deprivations were conducted pursuant to an express policy, statement, ordinance, or regulation that, when enforced, caused the constitutional deprivation; (2) the conduct was one of a series of incidents amounting to an unconstitutional practice so permanent and well-settled as to constitute a "custom or usage" with force of law; or (3) the conduct was a decision of a municipal policymaker with final policymaking authority in the area at issue. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000); *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995); *see Monell*, 436 U.S. at 690-91.

Defendants argue the doctrine of qualified immunity for Kruzel. Under that doctrine, government employees performing discretionary functions are shielded from liability unless their conduct violates a clearly established constitutional right of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, because the facts fail to support a finding of any constitutional violation, the court does not need to address the question of qualified immunity separately.

1. Equal Protection Claim

The equal protection clause of the Fourteenth Amendment commands that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. The clause directs that all persons similarly situated should be treated alike. *See* U.S. Const. amend. XIV; *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The equal protection guarantee concerns classifications. *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 712 (7th Cir. 2002).

> The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Nabozny v. Podlesny*, 92 F.3d 446, 453-54 (7th Cir. 1996) (quoting *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982)). Thus, to establish liability under the equal protection clause, a plaintiff must show that a defendant "acted with a nefarious discriminatory purpose" and discriminated against him based on his membership in a definable class. *Id.* at 453.

Even so, a plaintiff may constitute a "class of one." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). "[W]hen a 'powerful public official pick[s] on a person out of sheer vindictiveness,'" the equal protection clause may be violated. *Id.* (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)) (second alteration in original). To establish class-of-one discrimination a plaintiff must show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Martin*, 295 F.3d at 712 (internal quotation marks omitted).

Werth argues that the defendants violated his equal protection rights inasmuch as he was treated differently than other students because he was disabled or, alternatively, he was treated differently as a class-of-one. However, his evidence fails to support either theory. Werth points to no other student who was injured – by Larry W., Joe F., Roberto S. or anyone else – in any woodshop class or any other class and who was treated better by Kruzel or the School Board. Although Werth proffers that Kruzel experienced other incidents involving students throwing wood in class, he provides no evidence that those incidents were

handled differently. Further, he points to no evidence suggesting that Kruzel failed to stop the actions against Werth on either date at issue because of animus toward disabled students. Kruzel's woodshop class had forty students in it and no evidence indicates that the thirty-six students other than Werth, Larry W., Joe F., and Roberto S. were at less risk of having Larry W., Joe F., and Roberto S. act out against them. Also, no evidence suggests that Kruzel paid more attention to the safety of the other students than he did to Werth.

Upon close scrutiny, it is apparent that Werth's claim is that he was entitled to more than equal protection. He argues that Kruzel and the School Board should have protected him *more* than other students because he was disabled – thus treating him differently.

Further, Werth presents no evidence that Kruzel or the School Board exhibited any animus or vindictiveness against him personally. Although Kruzel stated at the IEP meeting that he did not believe Werth belonged in his class, Werth's proposed findings proffer that Kruzel's statement was due to the lack of an aide to accompany Werth throughout class. Hence, in the absence of evidence that Kruzel or the School Board treated Werth differently, Werth has failed to establish that there was any animus or vindictiveness underlying his treatment by Kruzel and the School Board, thereby making it unnecessary to address whether there was any rational basis for a difference in the treatment of students.

Werth devotes substantial discussion to IEP procedures and asserts that school officials failed to follow those procedures. However, in his Complaint he states that he is not seeking remedies under the IDEA. Regardless, his brief fails to establish how a failure to follow IEP procedures for Werth created an equal protection issue. Werth provides no evidence respecting similarly situated disabled students whose IEPs were generated and

14

implemented promptly.  And so, in short, he has failed to establish how the IEP issue relates to any dissimilar treatment.

This case stands in stark contrast to *Nabozny*.  There, the record contained numerous comments from school administrators that if Nabozny was going to be openly gay he deserved physical beatings and should expect harassment such as mock rapes to be committed against him by other male students.  *See Nabozny*, 92 F.3d at 451-52.  The *Nabozny* defendants did not deny that they aggressively punished male-on-female battery and harassment, whereas the male-on-male battery against Nabozny went unpunished.  *Id.* at 455.  In contrast, the present record shows no similar singling out of Werth by Kruzel or the School Board based on Werth's disability or any vindictiveness towards him alone, nor does the record disclose better treatment of other students as to complaints in Kruzel's or another teacher's class.  *If* Kruzel mismanaged his class in any way, there is no evidence before the court that he treated his students unequally.

As to the claim against the School Board, Werth has failed to establish that it violated his equal protection rights through any direct policy which discriminated against him. The undisputed facts show that Kruzel was a teacher, not a school district policymaker. Further, Werth has not proffered sufficient facts for a reasonable jury to find that the School Board had  any policy or practice of discrimination against the disabled or him personally.  At most, he has shown that the administrators at South Division may have delayed in preparing an IEP.  Regardless, no evidence suggests that a lapse at South Division constitutes a district-wide unwritten policy.  Moreover, Werth has failed to show that the School Board was even aware of the specific incidents or IEP involving him.  Hence, summary judgment must be granted in favor of the defendants on Werth's his equal protection claim for failure to

establish that Kruzel or the School Board made any classification based on disability or animus against Werth as a class of one.

2.     Substantive Due Process Claim

The due process clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. A person has a liberty interest in his or her own physical safety. *See Stevens v. Umsted*, 131 F.3d 697, 701 (7th Cir. 1997).

However, the due process clause is a safeguard against the actions of states and local governmental entities only. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* In other words, the purpose of the due process clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* Thus, a state's failure to protect an individual from private injury does not violate that individual's substantive due process rights. *Waubanascum v. Shawano County*, 416 F.3d 658, 665 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 1045 (2006).

However, based on language from *DeShaney*, the Seventh Circuit has recognized two exceptions to *DeShaney*'s general rule: (1) where the state has established a "special relationship" with an individual – for example if the person is an incarcerated prisoner or involuntarily committed mental patient or, in certain cases, a foster child, *id.*;

*Stevens*, 131 F.3d at 701-02; *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990); and (2) when the state "'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced,'" *Waubanascum*, 416 F.3d at 665 (quoting *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)); *Nabozny*, 92 F.3d at 459-60.

Generally, local school boards and officials have no "special relationship" with students and thus no affirmative substantive due process duty to protect them from injuries caused by other students. *Stevens*, 131 F.3d at 703; *Nabozny*, 92 F.3d at 459; *J.O.*, 909 F.2d at 272-73. Thus, Werth does not argue the "special relationship" exception.

Instead, he argues the state-created danger exception, i.e., that Kruzel and/or the School Board placed him in a position of danger he would not otherwise have been in. To prevail on this theory, Joseph must establish some affirmative act on the part of the defendants that either created a danger to him or rendered him more vulnerable to an existing danger. *Stevens*, 131 F.3d at 705. Affirmative conduct, not mere inaction, is required; inaction by a state actor in the face of a known danger is not enough to trigger a duty to protect one private citizen from another. *Id.*

In *Nabozny*, the plaintiff argued that the school defendants maintained a policy of failing to punish his assailants, thereby encouraging a harmful environment. 92 F.3d at 460. The harassment and physical injuries to Nabozny inflicted by his classmates on school property were extensive over several years and involved many of the same classmates on multiple occasions. *Id.* at 451-53. Still, the Seventh Circuit found no substantive due process violation because Nabozny's theory relied on the school officials' failure to act, and under *J.O.* there was no duty to act.

In *Stevens*, the plaintiff was a blind and developmentally disabled student at a residential school, where he was sexually assaulted repeatedly by other students. 131 F.3d

Case 2:05-cv-00040-CNC   Filed 01/22/07   Page 17 of 29   Document 27

at 699-700. Assaults continued even after the school superintendent had actual knowledge that the assaults were occurring. *Id.* at 700. The Seventh Circuit rejected Stevens's argument under the state-created danger exception, finding that his complaint alleged only a failure to act rather than an affirmative act and holding that the substantive due process claim had to be dismissed. *Id.* at 705-06. The court stated that just as in *DeShaney*, the most that could be said was that state officials stood by and did nothing when suspicious circumstances suggested more action was required. *Id.* at 705.

Here, the harassment and physical injuries to Werth occurred only on two days during the same school year, and by different actors on each date. Neither Kruzel nor the School Board knew of existing bad blood or any past incident between Larry W., Joe F., or Roberto S. and Werth. Especially in comparison to *Nabozny*, no reasonable jury could conclude that Kruzel or the School Board encouraged a dangerous climate at the school for Werth. Further, although in October 2001 Kruzel may have ignored the first incident he witnessed and did not take action the first two times Werth complained about Larry W. and Joe F., he did take action when Larry W. acted again, and precipitated Larry W.'s suspension. Also, the evidence shows that Kruzel acted right away following the January 2002 incident, and that Roberto S. was suspended as well. Thus, it is questionable whether Kruzel and the School Board could be deemed to have merely stood by in the face of circumstances they knew to be dangerous.

Moreover, any *inaction* that could be attributed to Kruzel and the School Board cannot constitute a substantive due process violation. To the extent Kruzel failed to act until Werth's third complaint on October, 16, 2001, or failed to act because he did not see visible signs of injury, any such failure to act cannot be the basis of liability, as under *J.O.* Kruzel and the School Board had no duty to act.

Werth contends that Kruzel knew Larry W. was "incorrigible" and Werth should not have been seated next to him. But no evidence supports a jury finding that Kruzel or the School Board placed Werth in a position of danger he would not otherwise have been in. Kruzel's class was a general class, not a special education class, and Werth was exposed to the general student population. Although Werth argues that the school or Kruzel affirmatively acted by placing him in the woodshop class, no evidence supports the argument. Werth fails to establish that the school or Kruzel, rather than he or his mother, chose the woodshop class for him. No evidence suggests that Kruzel or the School Board insisted on Werth being in a general rather than a special education woodshop class (if one existed). Instead, the evidence suggests that Mary Werth insisted that Werth be placed in Kruzel's woodshop class. (*See* Kruzel Dep. at 70 ("[T]he mother insisted he be in the least restrictive environment.").) Whether Larry W. sat next to Werth or elsewhere in the room, Larry W. was still in Werth's class and could have inflicted harm there or elsewhere in the school. Also, Werth did not provide any evidence that Kruzel or the School Board should have known about Joe F.'s or Roberto S.'s propensity for violence in advance. As far as the record is concerned, Werth was exposed to them and other students no more in Kruzel's woodshop class than anywhere else at the school. Although Kruzel occasionally had problems with students throwing pieces of wood in his class, Werth was not placed in any danger greater than that facing other students in woodshop class.

Werth argues that Kruzel and the School Board had a duty to protect him, based on the information his mother gave to Kruzel and the assistant principal prior to the October incident and his IEP by the date of the January incident. But regardless of any information relayed by Mary Werth or set forth in Werth's IEP, under *DeShaney* and *J.O.* Kruzel and the School Board owed Joseph no duty to protect him against the violence of other students.

Because the defendants did not create or increase any risk of harm to Werth, and cannot be held liable on the basis of any inaction on their parts, the court need not reach the question of whether the defendants acted (or failed to act) with deliberate indifference, necessary to create constitutional liability. *See Martin*, 295 F.3d at 710 n.10. For these reasons, summary judgment must be granted on Werth's substantive due process claim.

C.     Rehabilitation Act and ADA Claims

Werth sues the School Board under Title V of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132. These statutes were designed to protect disabled persons from discrimination in the provision of public services. *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 357 (S.D.N.Y. 2005). Title V, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Similarly, Title II, § 202 of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Because the reach of both statutes is the same, claims under these provisions are analyzed together. *K.M.*, 381 F. Supp. 2d at 357.

School district liability for peer-to-peer disability-based harassment under § 504 and the ADA has not been addressed directly by the United States Supreme Court. However, in *Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999), the Court addressed school district liability for peer-to-peer sexual harassment in violation of Title IX of the Education Amendments of 1972, which parallels § 504 and the ADA in regard to sex

discrimination in educational settings:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The *Davis* Court held that a school district may be held liable under Title IX if it is "deliberately indifferent" to peer-to-peer sexual harassment and its response is "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.  A school district found so liable is not held responsible for the actions of the harassing students, but rather for its own response to the acts of the harassing students.  *Id.* at 641-42.

Damages are not available for simple teasing and name-calling.  Instead, the conduct must be "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity."  *Id.* at 652.  A plaintiff must demonstrate harassment that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."  *Id.* at 651.  The Court cited as one example a situation where peer-to-peer sexual harassment physically deprives a student of access to school resources, such as where male students physically threaten female students every day and prevent them from using an athletic field or computer lab.  *Id.* at 650-51.  However, physical exclusion is not necessary.  *Id.*  The *Davis* Court noted the relevance of the relationship between the harasser and victim, including the position of power between them.  *Id.* at 653.

Subsequent to *Davis*, at least three federal courts have found that an inadequate response to peer-to-peer disability discrimination is actionable under § 504 and/or the ADA.  *M.P. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975 (8th Cir. 2003); *K.M.*, 381 F. Supp. 2d at 358-60; *Biggs v. Bd. of Educ.*, 229 F. Supp. 2d 437 (D. Md. 2002).  The Eighth Circuit

in *M.P.* did not discuss *Davis*, but used the general prima facia case standard for a case of disability discrimination under § 504 of the Rehabilitation Act: plaintiff must be (1) a qualified individual with a disability, (2) denied the benefits of a program or activity of a public entity receiving federal funds, and (3) discriminated against on the basis of his disability. *M.P.*, 326 F.3d at 981-82. The two district courts analyzed the peer-on-peer § 504 and ADA claims in light of *Davis* and found the elements of such claims to be: (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment. *Biggs*, 229 F. Supp. 2d at 444-45; *see K.M.*, 381 F. Supp. 2d at 359, 360-61.

The plaintiff in *M.P.* provided evidence that after the administrator disclosed his paranoid schizophrenia to the school community he was verbally abused and students slammed his head into a drinking fountain and his body into lockers, threw him to the floor, spit on him and scratched and cut him. The plaintiff's mother contacted school officials two or three times each week over several months to report the harassment the plaintiff endured, yet the school offered only three solutions, including home-schooling and transfer to an alternative learning center, all of which the mother found unacceptable. 326 F.3d at 978. The Eighth Circuit concluded that summary judgment had to be denied the defendant because disputed facts existed as to the effect of an administrator's disclosure of the plaintiff's disability to the school community, the resulting harassment, and the school district's failure to address and remedy the discrimination the plaintiff may have experienced due to his disability.

In *K.M.*, the court denied a defense motion for summary judgment where, over the course of two middle-school years, the plaintiff's disabled child had been subjected to verbal abuse and physical attacks in school and on the school bus. The child had been called "stupid" and "retard" repeatedly; he had been thrown to the ground by several students during lunch; he had been physically beaten by two boys; he had been subjected to disability-related slurs and had his school books thrown into the cafeteria garbage on five to eight occasions during one school year, resulting in a teacher having him eat lunch with him in a separate room for the remainder of the school year. Also, a student started a fistfight with the child on the school bus; a student took the child's planner; and two students repeatedly taunted and hit the child on the school bus. 381 F. Supp. 2d at 348. The child or his mother reported each incident to school officials but no action was taken to protect him from further harassment. *Id.* Further, the child had told the school nurse that a particular student had beaten him several times and that he had told the guidance counselors and teachers about it. *Id.* at 353. Plaintiff was advised following the second beating on the school bus to keep the child out of school for an indeterminate period, but no educational services for him were provided for a couple of months. *Id.* at 349, 356. School officials could not confirm the allegations the child made regarding the latter bus incident, and no one was disciplined. *Id.* at 350-51. Later, the child was admitted to a psychiatric emergency room. Afterward, psychiatrists reported that the child had suicidal ideation in response to the incidents of victimization at school. *Id.* at 349.

The *Biggs* court granted a motion to dismiss claims under § 405 and the ADA for peer-on-peer disability harassment, finding on the facts alleged in the complaint, that the defendant board of education was not deliberately indifferent to any harassment. 229 F. Supp. 2d at 445. Each time the disabled child or her mother complained to school officials,

the school took action, including counseling for the child, meetings with offending students, sending letters to parents, threatening suspension, and alerting teachers to the problem. *Id.*

In light of *Davis*, this court will apply the five specific elements of a peer-on-peer disability claim against a school district as set forth in *Biggs* and *K.M.* rather than the general elements for a Rehabilitation Act or ADA claim as set forth in *M.P.*

First, it is undisputed that Werth was disabled. Moreover, children with disabilities for purposes of IDEA are considered individuals with disabilities under § 504 and Title II as well. *K.M.*, 381 F. Supp. 2d at 358.

Regardless, Werth presents insufficient proof that he was harassed because of his disability. His evidence shows only that on October 16, 2001, Larry W. and Joe F. threw pieces of wood at him three times and that on January 14, 2002, Roberto S. teased Werth about his wood project and hit him with safety goggles. Although Mary Werth averred that Werth was subjected to verbal attacks and mockery by fellow students because of his disability, Werth has presented no evidence showing that these incidents were related to his disability. He has offered no proof that Larry W. or Joe F. teased or otherwise harassed him on October 16, 2001, or any day before that, because of his disability. Also, there is nothing in the record showing that Roberto S. teased Werth due to his disability or that Roberto S. teased or otherwise harassed him on any day because of his disability. In addition, there is no indication that Robert S. did anything that prevented Werth from working on his wood project or otherwise complete Kruzel's class. Thus, Werth has not established that he was denied the benefits of a federally funded program or activity due to his disability as required to prove the second element of his claim.

Next, Werth fails to establish the third element, i.e., the harassment was severe or pervasive. The two incidents in this case were brief and separated by time. The Supreme

Court in *Davis* indicated that the harassment must have the *systemic* effect of denying the victim equal access to an educational program or activity, and that a single instance of severe peer-on-peer harassment is not enough:

> Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigations that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment. By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior.

526 U.S. at 652-53. Here, the two incidents against Werth involved different offenders, on different dates, three months apart. Thus, under the circumstances, the court does not see much difference between the two incidents in this case and the one incident, discussed by the Supreme Court in *Davis*. And if the October 16, 2001, incident is considered three separate incidents rather than one, the court is satisfied that a reasonable jury would not find on the facts of the present case that the wood tossing incidents in this case had a systemic effect on Werth's access to education. Perhaps in other situations two incidents, if severe enough or if other circumstances existed, could suggest systemic denial of programs or activities. But here, these two incidents in Kruzel's class were isolated and were not pervasive.

Werth also fails to satisfy the fourth element of a peer-on-peer disability claim regarding knowledge of any harassment prior to the two incidents. He does not establish that Kruzel or any school administrators knew of student harassment of Werth at other MPS schools prior to Werth's attendance at South Division. Moreover, he fails to show that Kruzel, a South Division administrator, or School Board members knew of any incidents involving

Werth at South Division prior to October 16, 2001. All Werth presents is hearsay that Kruzel heard from other teachers at some unspecified time that unspecified students in unspecified classes harassed Werth in unspecified ways. No viable evidence in the record suggests that prior to October 16, 2001, Kruzel or other school officials had any basis for thinking Larry W. posed a threat to Werth particularly; Werth offers no proof that prior to that date Larry W. harassed him in any way or that Larry W. was prone to harassing disabled students more than any other students. The evidence shows only that Larry W. was rough, and roughness toward all does not equate with harassment of Werth. Also, Werth admits that on January 14, 2002, Kruzel could not hear Roberto S. teasing Werth. Further, Werth has presented no evidence showing that prior to the January 14, 2002, incident Kruzel or other school officials had any basis for thinking Roberto S. was part of any prior harassment or that teachers and school officials should have been tipped off about mistreatment of Werth because of prior incidents at South Division.

However, Werth does establish knowledge on the part of South Division administration of the actual incidents on October 16, 2001, and January 14, 2002. On both occasions, Werth reported the incidents to Kruzel and Kruzel wrote up Larry W. as well as Roberto S. and sent those students to the school office, so that higher school administrators knew of those incidents.

But this evidence falls short of establishing that the defendants were deliberately indifferent to any harassment. School administrators enjoy flexibility in disciplinary decisions responding to student-on-student harassment unless the response is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Although Kruzel may have done nothing at first after seeing Larry W. or Joe F. throw wood at Werth, the third time Kruzel wrote up Larry W. and both students were later suspended. Perhaps Kruzel could have

handled the situation better by talking with the students after the first incident, but no reasonable jury could find that Kruzel's failure to write Larry W. up immediately rather than after the second time he threw wood blocks was "clearly unreasonable" in the context of a high-school woodshop class. Notably, the school took further action in telling Werth that he and Joe F. would not be in any more classes together, and no evidence suggests that Joe F. and Werth attended classes together subsequently. Moreover, Larry W. was no longer at the school.

School officials took additional action when Roberto S. hit Werth with safety goggles. Kruzel said he took Werth at his word, wrote Roberto S. up, and sent Roberto S. to the school office. Roberto S. was then suspended.

The school's reactions to Werth's complaints are more similar to the actions taken in *Biggs* than to the complete lack of action taken over the course of two school years by the teachers and school officials in *K.M.* and to the inadequate response in *M.P.* The disciplinary actions taken by South Division school officials – suspensions rather than other measures – were not clearly unreasonable. Thus, no reasonable jury could find for Werth on elements two, three, and five of his § 504 and ADA peer-to-peer harassment claims. Therefore, summary judgment must be granted in defendants' favor.

D.    State Law Claims

Next, the court turns to Werth's state law tort claim against the School Board. He asserts that the School Board supervised and trained Kruzel negligently, and that Kruzel's negligent training proximately caused Werth's injuries. (Compl. at 7.) The School Board contends that it is immune from such liability under the discretionary-act immunity of Wis. Stat. § 893.80(4). Because the School Board seeks summary judgment based on

discretionary-act immunity, this court assumes the existence of negligence.  *Scott v. Savers Prop. & Cas. Ins. Co.*, 2003 WI 60, ¶ 29, 262 Wis. 2d 127, ¶ 29.

Generally, Wisconsin law grants immunity to public officers for discretionary acts performed within the scope of their duties. *Sheridan v. City of Janesville*, 164 Wis. 2d 420, 425 (1991); *see* Wis. Stat. § 893.80(4).  Werth argues one exception to immunity, contending that immunity is not available to a public employer when it or its employee's actions are ministerial duties imposed by law.  (Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J. at 19.)  A duty is ministerial only if "it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes, and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion."  *Scott*, 2003 WI 60, ¶ 27, 262 Wis. 2d 127, ¶ 27.

Werth contends that the IDEA and its accompanying regulations created a ministerial duty for the school district to have an IEP in place at the beginning of the school year, implement the IEP as soon as possible, make the IEP accessible to each of the student's regular education teachers, and make sure that each regular education teacher was informed about his or her specific responsibilities in implementing the IEP.  (Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J. at 19-20.)  According to Werth, the School Board had an absolute duty to implement the IEP and educate, train, and supervise Kruzel in the IEP's implementation.  (*Id.* at 20.)

Werth's argument suffers a fatal flaw:  he fails to connect this alleged ministerial duty to any damages.  The negligence that the court assumes in this case is the School Board's failure to supervise or train Kruzel, and the only damages Werth asserts in this case stem from the October 16, 2001, and January 14, 2002, incidents in woodshop class.  Werth has not directed the court to any evidence that these incidents would have been prevented

had the IEP been in place earlier and/or followed.  Furthermore, Werth submitted the IEP too late for consideration – after defendants filed their reply brief.  But even if the submission had been permitted by the court, Werth fails to provide any proposed findings of fact regarding the IEP's contents or point the court to a particular page of the IEP that relates to the two woodshop incidents.  "The parties bear the burden of identifying evidence that will facilitate the court in determining whether a material issue of fact exists."  *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1010 n.2 (7th Cir. 1997).  Federal courts "are not obliged to scour the record looking for factual disputes."  *Id.*  Thus, summary judgment must be granted on this claim.

CONCLUSION

For the foregoing reasons,

IT IS ORDERED that the motion for summary judgment of Kruzel and the School Board is granted and the claims against these defendants are dismissed.

Because Werth alleges a claim against the state Department of Health and Family Services only because it paid medical expenses and may seek reimbursement from any recovery by Werth (Compl. at 2; Answer of Wis. DHFS at 2-3), and no such recovery can occur,

IT IS ORDERED that Werth's claims against the Department of Health and Family Services are also dismissed.

Dated at Milwaukee, Wisconsin, this 22nd day of January, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge